UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
LARRAYSHA CONKLIN,

                       Plaintiff,

           - against -

POLICE OFFICER SARA MORRIS and
POLICE OFFICERS JOHN DOE 1-10, *all of
whom are sued individually and in their official
capacities*,

                   Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-3805 (PKC) (CLP)

PAMELA K. CHEN, United States District Judge:

New York City Police Department ("NYPD") Sergeant Sarah Morris seeks summary

judgment against Plaintiff Larraysha Conklin, who brought this action under 42 U.S.C. § 1983.

For the following reasons, Defendant Morris's motion is granted and this case is dismissed.[1]

## BACKGROUND

### I.   Factual Background[2]

On July 1, 2015, and for a period of time prior thereto, Plaintiff and her four children

resided on the first floor of 117-18 219th Street, Queens, New York (the "Premises").

(Defendant's Response to Plaintiff's 56.1 Statement ("Pl. 56.1"), Dkt. 57, ¶ 3.)  The Premises

consists of three floors: a basement, first floor, and second floor.  (Certificate of Occupancy, Dkt.

---

[1] The John Doe Defendants have not been identified or served.  As discussed further below, although the motion for summary judgment was filed on behalf of Defendant Morris only, the Court *sua sponte* dismisses all claims against the John Doe Defendants as well.

[2] The following facts, taken from the parties' Local Civil Rule 56.1 statements and relevant parts of the summary judgment record, are undisputed unless otherwise noted.  To the extent "the record does not support certain critical assertions" in the parties' 56.1 statements, the Court has disregarded those unsupported assertions. *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003).

24-1.)  The front door allows entrance to the first floor.  (Pl. 56.1, Dkt. 57 ¶ 5.)  There is access to the basement through the first-floor kitchen (*id.* ¶ 7), and an interior door within one of the first-floor bedrooms provides access to a stairway to the second floor (*id.* ¶ 8).  The second floor is also accessible from an outside doorway on the side of the Premises, which has a separate doorbell.  (*Id.* ¶¶ 10–11.)  In July 2015, the basement was occupied by Plaintiff's brother, Lawrence Conklin, while the second floor was occupied by a separate tenant, whom Plaintiff did not know.  (*Id.* ¶¶ 13–15; Defendant's 56.1 Statement ("Def. 56.1"), Dkt. 55, ¶ 19.)

Beginning in the spring of 2014, Defendant Morris, an NYPD police officer, was assigned to investigate potential financial crimes occurring on the Premises.  (Pl. 56.1, Dkt. 57, ¶¶ 2, 18.)  Plaintiff was not the subject of the investigation.  (*Id.* ¶ 19.)  During the investigation, the NYPD utilized a confidential informant, who had been employed in obtaining five separate search warrants that resulted in recovered contraband.  (*Id.* ¶ 20; Def. 56.1, Dkt. 55, ¶¶ 4–5.)  On three separate occasions, the confidential informant entered the first floor of the Premises through the front door, proceeded to the basement, and purchased forged credit cards in exchange for cash.  (Pl. 56.1, Dkt. 57, ¶ 20; Def. 56.1, Dkt. 55, ¶¶ 5–6.)  On one occasion, the confidential informant told Defendant Morris that the forged credit card was purchased from an individual named "Lawrence."  (Def. 56.1, Dkt. 55, ¶ 7.)  The investigation revealed that Plaintiff's brother is Lawrence Conklin.  (*Id.* ¶ 19.)  Defendant Morris subsequently showed the confidential informant a picture of Lawrence Conklin and the confidential informant identified Lawrence Conklin as the person who had sold the forged credit card to the informant.  (Search Warrant Affidavit, Dkt. 54-2, at ECF[3] 7.)

---

[3] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

In preparation for a search warrant application, Defendant Morris performed several public record database inquiries, including searches for domestic incident reports, arrest reports, complaint reports, warrants, and licenses for weapons in connection with the Premises. (Def. 56.1, Dkt. 55, ¶ 10; Database Query Report, Dkt. 54-4.)  Additionally, Defendant Morris searched Consolidated Edison ("ConEd") power service records, which showed that there were two separate ConEd meters on the Premises—one for the first floor and another for the second floor—although both were in the name of Julene Mercano, Plaintiff's mother. (Def. 56.1, Dkt. 55, ¶¶ 10, 16; *see also* ConEd Records, Dkt. 60-11, Exhibit K.)  Defendant Morris did not search for a Certificate of Occupancy. (Pl. 56.1, Dkt. 57, ¶ 22.)  Defendant Morris and another NYPD officer, Sergeant Michael Sykora, also conducted reconnaissance of the Premises. (Def. 56.1, Dkt. 55, ¶ 9.)  The officers observed that the Premises had one mailbox, one driveway, and one street number. (*Id.* ¶ 12.)  While there was a side door with a doorbell, the door neither had a separate mailbox nor an address marker. (*Id.* ¶ 13.)

On June 30, 2015, Defendant Morris appeared before the Queens County Criminal Court, where she applied for a search warrant. (Pl. 56.1, Dkt. 57, ¶ 26; Def. 56.1, Dkt. 55, ¶ 23.)  In the application, Defendant Morris listed the Premises as a "single family detached brick house." (Search Warrant Affidavit, Dkt. 54-2, at ECF 2.)  The search warrant affidavit provided information regarding the investigation of the Premises, including the purchase of forged credit cards by the confidential informant. (Search Warrant Affidavit, Dkt. 54-2, at ECF 4–8.)  The magistrate judge issued a search warrant for the Premises to search and seize any computers, computer related equipment, external storage media, portable storage media, credit card applications, and various types of documents and records. (Pl. 56.1, Dkt. 57, ¶ 28.)

On July 1, 2015, at 7:20 a.m., an Emergency Service Unit ("ESU") team, executing the warrant, forcibly entered Plaintiff's home through the front door. (*Id.* ¶ 29.) Plaintiff and her family were asleep when the ESU team entered. (*Id.* ¶¶ 31–33.) Plaintiff, her children, and her two younger sisters were asleep on the first floor. (*Id.* ¶¶ 31–32.) Plaintiff's mother, Julene Mercano, who was visiting Plaintiff at the time, was asleep in the basement. (*Id.* ¶ 33.) Plaintiff's brother, Lawrence Conklin, who resided in the basement, was not present. (Def. 56.1, Dkt. 55, ¶ 19.) Once the Premises were secured, Defendant Morris and other officers entered to conduct a search of the first floor. (*Id.* ¶ 30.) Plaintiff and her family were initially confined in the living room, but were later removed to the backyard. (Pl. 56.1, Dkt. 57, ¶¶ 36–37.) Plaintiff and Mercano were handcuffed after being removed to the backyard. (*Id.* ¶ 38.)

During the search of the first floor, Defendant Morris and other officers found and seized several designer handbags, $397 in cash, credit cards, laptops, phones, and an Apple watch. (Def. 56.1, Dkt. 55, ¶ 32.) In the basement, officers found and seized more designer handbags, $10,000 in cash, cell phones, mail, a chemical storage tank that was empty, and bank documents. (Pl. 56.1, Dkt. 57, ¶ 40; Def. 56.1, Dkt. 55, ¶ 33.) The officers also found two electricity meters. (Pl. 56.1, Dkt. 57, ¶ 16.) ConEd representatives who arrived at the Premises during the search determined that there was approximately $64,792.73 in unmetered electrical service diverted from the first floor to the second floor of the Premises. (*Id.* ¶ 47; Preliminary Estimated Bill for Unmetered Service, Dkt. 60-12.)

After conducting a search of the first floor and basement, officers attempted to reach the second floor. The interior door that led from a first-floor bedroom to the second floor was barricaded by heavy furniture and was inaccessible. (Pl. 56.1, Dkt. 57, ¶¶ 8–9.) The ESU team and Defendant Morris exited the Premises and went to the side door. (*Id.* ¶¶ 42–43.) Because

Plaintiff did not have a key for this door, the ESU team forced entry into the second floor.  (*Id.* ¶¶ 12, 43.)  Upon entry, officers found and seized 41 marijuana plants, with an aggregate weight of approximately 10 pounds, and equipment and chemicals used to grow marijuana.  (*Id.* ¶ 45.)

Defendant Morris arrested Plaintiff for grand larceny in the second degree (N.Y. Penal Law § 155.40), criminal possession of marijuana in the first degree (N.Y. Penal Law § 221.30), theft of services (N.Y. Penal Law § 165.15), endangering the welfare of a child (N.Y. Penal Law § 260.10), and criminally using drug paraphernalia in the second degree (N.Y. Penal Law § 220.50).  (Def. 56.1, Dkt. 55, ¶ 38; Arrest Report, Dkt. 54-28.)  Plaintiff was subsequently charged with grand larceny in the second degree (N.Y. Penal Law § 155.40-1), criminal possession of marijuana in the first degree (N.Y. Penal Law § 221.30), and two counts of theft of services (N.Y. Penal Law § 165.15-4A and N.Y. Penal Law § 165.15-7).  (Pl. 56.1, Dkt. 57, ¶ 48; Criminal Complaint, Dkt. 60-16, at ECF 2–3.)

Following the arrest, Defendant Morris filed a Report of Suspected Child Abuse or Maltreatment form, notifying Susan Tucker from the Administration for Children's Services ("ACS") of the "marijuana growhouse."  (Pl. 56.1, Dkt. 57, ¶ 50; Report to ACS, Dkt. 60-8.)  ACS was also notified of Plaintiff's arrest.  (Pl. 56.1, Dkt. 57, ¶¶ 51–52.)  Plaintiff's children were removed from her custody for approximately nine months following the arrest.  (*Id.* ¶ 56.)  Defendant Morris gave testimony during Ms. Mercano's family court proceeding regarding visitation rights with her grandchildren, Plaintiff's children.  (*Id.* ¶ 54.)

On March 2, 2016, Plaintiff received an adjournment in contemplation of dismissal, pursuant to N.Y. Crim. Proc. Law § 170.55, and was required to participate in a supervised release program to regain custody of her children.  (*Id.* ¶¶ 58–60; Def. 56.1, Dkt. 55, ¶ 43.)  Plaintiff

successfully completed the program and regained custody of her children on March 29, 2016.  (Pl. 56.1, Dkt. 57, ¶¶ 60–61.)

On June 29, 2018, Plaintiff initiated the instant action against Defendants, alleging an unlawful search and false arrest, in violation of her rights under the Fourth and Fourteenth Amendments.  (*Id.* ¶ 1.)

## II.   Plaintiff's Failure to Provide a Compliant 56.1 Statement

Local Rule 56.1(b) requires that "[t]he papers opposing a motion for summary judgment . . . include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  E.D.N.Y. Local Rule 56.1(b).  Despite being represented by counsel, Plaintiff did not provide a 56.1 Statement that complies with the Local Rule.  Defendant Morris therefore asks that the Court deem the facts contained in Defendant's 56.1 Statement admitted. (Defendant's Reply, Dkt. 58, at ECF 6.)  The Court declines to do so.

"A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).  "[W]hile a court is not required to consider what the parties fail to point out in their Local 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement."  *Id.* (internal quotation marks and citations omitted); *cf. Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004) ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law.").  Thus, although Plaintiff  has failed to comply with Local Rule 56.1(b), she did provide her own factual account of the case and attached relevant non-duplicative exhibits.  (*See generally*

Plaintiff's Brief ("Pl. Br."), Dkt. 59); *Thigpen v. Bd. of Trs. of Local 807 Labor-Mgmt. Pension Fund*, No. 18-CV-162 (PKC) (LB), 2019 WL 4756029, at *1 (E.D.N.Y. Sept. 29, 2019) (declining to deem defendants' 56.1 statement admitted when plaintiff "provide[d] her own factual account of the case and attached numerous, non-duplicative exhibits"). The Court will "examine the record to determine whether there are any triable issues of material fact, notwithstanding the fact that [Plaintiff] did not follow Local Civil Rule 56.1." *Cain v. Esthetique*, 182 F. Supp. 3d 54, 63 (S.D.N.Y. 2016).

## STANDARD OF REVIEW

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (The summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248). "To present a 'genuine' issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (quoting *Anderson*, 477 U.S. at 248).

"[A]t the summary judgment stage, the district court is not permitted to make credibility determinations or weigh the evidence. . . ." *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021). It must "consider the record in the light most favorable to the non-movant" and "resolve all ambiguities and draw all factual inferences in favor of the non-movant 'if there is a "genuine"

dispute as to those facts.'" *Loreley*, 13 F.4th at 259 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

"The moving party bears the burden to demonstrate the absence of any genuine issues of material fact. . . ." *Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016). Once this burden is met, the burden shifts to the nonmoving party to proffer some evidence establishing the existence of a question of material fact that must be resolved at trial. *See Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A mere "scintilla of evidence" in support of the non-moving party is insufficient; "there must be evidence on which the jury could reasonably find for the non-movant." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003). That is, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis omitted).

"A party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record," or "(B) showing that the materials cited do not establish the absence . . . of a genuine dispute. . . ." Fed. R. Civ. P. 56(c). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e). Thus, "a non-response runs the risk of unresponded-to statements of undisputed facts proffered by the movant being deemed admitted." *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014). Even when a summary judgment motion is unopposed, however, the court may "rely on other evidence

in the record even if uncited," and "must determine whether the legal theory of the motion is sound." *Id.*

## DISCUSSION

### I.      Section 1983

Section "1983 does not confer any substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Village of Freeport v. Barrella*, 814 F.3d 594, 600 n.8 (2d Cir. 2016) (citation and internal quotation marks omitted).  "To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014).  "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Brandon v. Kinter*, 938 F.3d 21, 36 (2d Cir. 2019).

### II.     Unlawful Search

Defendant Morris seeks summary judgment on Plaintiff's unreasonable search claim on the basis that the search was conducted pursuant to a valid warrant.  (Defendant's Brief ("Def. Br."), Dkt. 56, at 6–11.)  Plaintiff counters that the search warrant affidavit incorrectly identified the Premises as a "single family dwelling" when it was in fact a multi-family dwelling.  (Pl. Br., Dkt. 59, at 4.)  Plaintiff further alleges that Defendant Morris lacked probable cause to search the second floor apartment and therefore the search was unlawful.  (*Id.* at 7.)

#### A.      Legal Standard

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV; *see also* Fed. R. Crim. P. 41.

1.    The Affidavit

A Section 1983 plaintiff challenging a warrant affidavit on the ground that it deliberately or recklessly misled the issuing judge regarding the basis of probable cause "must make the same showing that is required at a suppression hearing" under *Franks v. Delaware*, 438 U.S. 154 (1978). *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994). Specifically, a plaintiff must make a "substantial preliminary showing," *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991) (internal quotations and citation omitted), that "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause or necessity finding," *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (brackets omitted) (quoting *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000)). The Second Circuit has made clear that "*Franks* protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." *Id.* at 154 (quoting *United States v. Awadallah*, 349 F.3d 42, 68 (2d Cir. 2003)).

When a warrant is based upon information obtained through the use of a confidential informant, the Court must assess whether probable cause exists to support a search warrant "by examining the 'totality of the circumstances' bearing upon [the] reliability" of information obtained through the use of a confidential informant. *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983)). "The ultimate inquiry is whether, after putting aside erroneous information and [correcting] material omissions, 'there remains a residue of independent and lawful information sufficient to support [a finding of] probable cause [or necessity].'" *Canfield*, 212 F.3d at 718 (quoting *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985)). To be sure, "[t]he *Franks* standard is a high one." *Rivera*, 928 F.2d at 604.

10

2.     The Particularity Requirement

The Warrants Clause of the Fourth Amendment "was intended as a bulwark against 'the "general warrant" abhorred by the colonists' and protects against 'a general, exploratory rummaging in a person's belongings.'" *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).  "To achieve its goal, the Warrants Clause requires particularity and forbids overbreadth."  *Id.*  Particularity "is the requirement that the warrant must clearly state what is sought."  *Id.* (citation omitted). "Particularity" concerns arise "when a warrant's description of the place to be searched or the items to be seized 'is so vague that it fails reasonably to alert executing officers to the limits of their search and seizure authority.'"  *United States v. Scully*, 108 F. Supp. 3d 59, 90 (E.D.N.Y. 2015) (quoting *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011)).  To satisfy the "particularity" requirement, "[a] warrant must be sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize."  *United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (cleaned up).

In the context of inaccurate information on a search warrant, the Supreme Court has made clear that "items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued."  *Maryland v. Garrison*, 480 U.S. 79, 85 (1987).  Therefore, a search warrant inaccurately identifying the place to be searched will nevertheless be "upheld against a particularity challenge if the warrant described the structure as it was known or should have been known to the officers after reasonable inquiry under the circumstances."  *United States v. Maneti*, 781 F. Supp. 169, 179 (W.D.N.Y. 1991) (citing *Garrison*, 480 U.S. at 85).

3.     Standing

"The [Fourth] Amendment protects persons against unreasonable searches of 'their persons [and] houses' and thus indicates that the Fourth Amendment is a personal right that must be

invoked by an individual." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *see also Katz v. United States*, 389 U.S. 347, 351 (1967) ("[T]he Fourth Amendment protects people, not places").  The Supreme Court has held that "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *see also Rawlings v. Kentucky*, 448 U.S. 98, 106 (1980).  Accordingly, "[t]he text of the Amendment suggests that its protections extend only to people in 'their' houses." *Carter*, 525 U.S. at 89.

**B.   Analysis**

1.   Plaintiff Has Not Satisfied the High Bar Imposed by *Franks*

Plaintiff alleges that the search warrant affidavit incorrectly identified the Premises as a "single family dwelling," when it was in fact a multi-family dwelling, and that the misstatement was necessary to the issuing judge's finding of probable cause.  (Pl. Br., Dkt. 59, at 4.)  Plaintiff relies on two sets of facts—one of which is in dispute—to suggest that Defendant intentionally, or with reckless disregard for the truth, incorrectly identified the Premises as a single-family unit in her search warrant affidavit.  However, even taken as true, the facts Plaintiff relies on fail to make the requisite showing under *Franks*.

First, Plaintiff emphasizes that Defendant failed to check the Certificate of Occupancy, which identified the Premises as a multi-unit building, and did not personally review the ConEd records showing that the Premises had two electrical meters.  (Pl. 56.1, Dkt. 57, ¶¶ 22–23.)  However, failure to check these records, without more, cannot be considered a deliberate or reckless disregard of the truth.  *United States v. Fennell*, 496 F. Supp. 2d 279, 282 (S.D.N.Y. 2007) (rejecting argument that failure to obtain utility records violates the Fourth Amendment if the investigation was otherwise reasonable).  This is because courts consider "the reasonableness of law enforcement's total inquiry," not isolated records checks.  *Id.*  Defendant Morris undertook

12

other investigatory measures, including the reconnaissance conducted by Defendant Morris and

Sergeant Sykora, which revealed that the Premises has a single house number, driveway, and

mailbox. (Def. 56.1, Dkt. 55, ¶ 9.) The Court's review of the photographs of the Premises confirm

these observations. (*See* Photographs of the Premises, Dkts. 54-7, 54-8.) And although the ConEd

records indicated two separate meters, they were both under a single account, suggesting, in light

of the other evidence, that the Premises was a single-family residence. *See, e.g.*, *United States v.

Gibeault*, No. 20-CR-1003, 2021 WL 5816138, at *3 (2d Cir. Dec. 8, 2021) (upholding warrant as

valid because public records did not indicate the property was a multi-family dwelling and there

was one mailbox and one driveway); *United States v. Santore*, 290 F.2d 51, 66 (2d Cir. 1960) (*en

banc*) (upholding search warrant that described dwelling as a one-family residence because agents

had no reason to know it was actually subdivided into two units), *cert. denied*, 365 U.S. 834 (1961);

*United States v. Maneti*, 781 F. Supp. 169, 179–80 (W.D.N.Y. 1991) ("[I]f the building in question

appears to be a single-family structure and the investigating officers neither knew nor had reason

to know of the structure's actual multiple-occupancy character until execution of the warrant was

under way, then the warrant is not defective for failing to specify a particular subunit.").

Second, Plaintiff states that Defendant Morris had been at the Premises on two occasions

in 2009. (Pl. 56.1, Dkt. 57, ¶¶ 24–25.) Plaintiff asserts that "Defendant had entered into the

second-floor apartment on at least one of these occasions." (*Id.*) Even taken as true, this fact does

not help Plaintiff's argument. The related police reports reveal that in April 2009, Defendant

Morris entered an NYPD complaint report regarding a visit to the Premises in response to a missing

person call from Julene Mercano, Plaintiff's mother, who was worried about the whereabouts of

her then-foster daughter (not Plaintiff). (Police Reports, Dkt. 60-19.) And in December 2009,

Defendant Morris visited the Premises in response to two domestic incident calls, also related to a

conflict between Julene Mercano and her foster-daughter. (*Id.*) Notably, both reports record the address of the Premises without any references to separate apartment units and there is no evidence in the record to suggest that Defendant Morris entered the second floor of the Premises from the side door (assuming she entered the second floor at all) or that she inspected the Premises from the inside, such that she would have been able to determine that this was a multi-family house with a separate entry for the second floor apartment. (*See id.*) Moreover, even assuming that Defendant Morris did enter the second floor of the Premises through the side door, these prior visits and her subsequent application for a search warrant are separated by nearly *six* years—a significant amount of time that excuses a reasonable officer for failing to remember how a house she visited was configured. *See Fennell*, 496 F. Supp. at 282 ("Defendant argues that Lt. Centamore previously executed a search warrant on the 'second floor apartment' of 294 First Street in January 2003, and thus, when executing the current warrant in August 2006, the police should have known that the premises was a multi-family residence. This argument fails. . . . [The] Court [does not] fault Lt. Centamore for not remembering a warrant he executed more than three years earlier, given that he testified that he has sworn out more than 2000 warrants in his career, including at least 150 between January 2003 and August 2006."). No reasonable jury could find that Defendant Morris filled out the search warrant affidavit with deliberate or reckless disregard of the truth in light of these facts, coupled with the investigatory efforts she undertook and the outward appearance of the Premises as a single-family home.

Even if Plaintiff were able to satisfy the first prong of the *Franks* analysis, she cannot meet the second, that is, Plaintiff's claims "fail under the 'corrected affidavit' doctrine because a hypothetical warrant affidavit, deleting the purported misstatements and including the challenged omissions, would not affect the probable cause determination." *Coderre v. City of Wallingford*,

668 F. App'x 399, 399–400 (2d Cir. 2016); *see also Daniels v. City of New York*, No. 16-CV-190 (PKC) (JO), 2018 WL 4119191, at *6 (E.D.N.Y. Aug. 29, 2018) (granting summary judgment after assuming *arguendo* that Plaintiff could satisfy the first part of *Franks*).  Here, Plaintiff would have to show that a court would not have issued the warrant had the affidavit described the Premises as a multi-family house.  As outlined in the search warrant affidavit, Defendant Morris employed a confidential informant, who had proven reliable in five separate search warrant applications that resulted in the recovery of contraband.  (Def. 56.1, Dkt. 55, ¶ 4.)  On three separate occasions, officers searched the confidential informant for potential contraband and sent the informant into the Premises to purchase a forged credit card.  (*Id.* ¶ 5; Search Warrant Affidavit, Dkt. 54-2.)  On all three occasions, the confidential informant entered through the front door, went into the basement, and returned with a forged credit card.  (Def. 56.1, Dkt. 55, ¶ 6.)  The confidential informant reported that on one occasion, the transaction was executed with someone named "Lawrence," and the informant subsequently identified "Lawrence" as Plaintiff's brother, Lawrence Conklin, who lived in the basement of the Premises.  (*Id.* ¶¶ 7, 19; Search Warrant Affidavit, Dkt. 54-2, at ECF 7.)  Plaintiff does not dispute any of the abovementioned facts related to the controlled buys.  It was these facts, and not the number of families living in the home, that provided the basis for the magistrate judge's probable cause finding.  These investigatory findings made the warrant not "so facially deficient that reliance upon it is unreasonable."  *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992); *see also United States v. Moody*, No. 20-CR-6070 (CJS), 2021 WL 202698, at *8 (W.D.N.Y. Jan. 19, 2021) (upholding validity of warrant that identified a two-family dwelling as a single-family dwelling because confidential informant's purchase of fentanyl created probable cause to search the entire premise), *report and recommendation adopted*, 2021 WL 1054372 (W.D.N.Y. Mar. 19, 2021); *United States v. Worjloh*, 546 F.3d 104, 109 (2d

15

Cir. 2008) (upholding validity of warrant that classified a multi-family home as a single-family home).

### 2.    The Warrant Does Not Violate the Particularity Requirement

Plaintiff also asserts that the failure to correctly specify the type of home meant the warrant violated the "particularity requirement" of the Fourth Amendment Warrants Clause.  (Pl. Br., Dkt. 59, at 4.)  Even if the warrant is valid under *Franks*, the failure to correctly specify the type of premises may render the warrant deficient under the "particularity requirement."  Plaintiff cites *United States v. Wiggins*, 298 F.R.D. 75 (E.D.N.Y. 2014) to support the proposition that Defendant conducted an unreasonable inquiry into the Premises and that Defendant knew or should have known that the Premises was a multi-family dwelling.  (Pl. Br., Dkt. 59, at 4–5.)  In *Wiggins*, officers incorrectly identified a multi-family home as a single-family home in their search warrant affidavit.  *Wiggins*, 298 F.R.D. at 78.  In preparation for the search warrant affidavit, the officers checked public and utility records, and conducted surveillance on the property.  *Id.* at 80. Regarding the public and utility records, the officer "ran an 'Accurint' report which lists various people who have lived or received mail at an address over many years."  *Id.* at 78.  The report listed the property under a different last name than the person the police were investigating.  *Id.* One of the officers testified that upon seeing this report, the officer believed that "multiple people lived at that location."  *Id.* at 80.  The utility records also revealed that there were two accounts listed at the residence.  *Id.*  The court found that the officers knew or should have known that multiple families resided at the house, and did not credit the officers' testimony that they did not observe other families come and go from the building after months of surveillance because one of the families left daily to take their children to school.  *Id.*  The court's decision rested on the fact that the officers had not conducted a reasonable investigation of the property prior to filing for a search warrant.  *Id.* at 80–81.

16

The present case is distinguishable in several ways.  First, other than the Certificate of Occupancy, which Defendant Morris did not review, nothing suggested the Premises was a multi-family home.  Second, the utility records revealed that there was a single account for the entire Premises, listed under Plaintiff's mother's name.  (Def. 56.1, Dkt. 55, ¶ 16.)  Finally, Plaintiff does not allege, nor do the facts suggest, that the Premises had the same "comings and goings" as the property in *Wiggins*.  Investigative measures taken by Defendant Morris in preparation for the search warrant application were not unreasonable.  Courts have found this level of investigation sufficient to satisfy the particularity requirement.  For example, in *Gibeault*, the Second Circuit found that surveillance and record checks were sufficient where the home had one driveway and one mailbox.  *Gibeault*, 2021 WL 5816138, at *3.  In *Maneti*, the court found that the particularity requirement is satisfied "if the building in question appears to be a single-family structure and the investigating officers neither knew nor had reason to know of the structure's actual multiple-occupancy character until execution of the warrant was under way."  781 F. Supp. at 179–80; *see also United States v. Villegas*, No. 92-CR-699 (CSH), 1993 WL 535013, at *3–4 (S.D.N.Y. Dec. 22, 1993) ("The only showing made by Jaramillo is that he knew that he lived separately from Casas and Sanchez, not that this knowledge was conveyed to the government.").  Because the information reasonably known to Defendant Morris "at the time [she] acted" suggested that the Premises were a single-family home, the Court finds the warrant valid.  *Maryland*, 480 U.S. at 85.

      3.    <u>Plaintiff Has No Standing To Assert Claims Based on the Search of the Second Floor Apartment</u>

Plaintiff further alleges that the officers lacked probable cause to search the second floor apartment and therefore the search was unlawful.  (Pl. Br., Dkt. 59, at 7–9.)  As Plaintiff insists that the second floor apartment was occupied by a tenant unknown to her at the time the search was executed, Plaintiff does not have standing to claim a reasonable expectation of privacy in

someone else's apartment.  In order to bring an unreasonable search claim, Plaintiff must show that "the challenged conduct invaded [her] legitimate expectation of privacy rather than that of a third party."  *United States v. Payner*, 447 U.S. 727, 731 (1980); *Carter*, 525 U.S. at 88 ("[T]he Fourth Amendment is a personal right that must be invoked by an individual."); *Katz*, 389 U.S. at 351 ("[T]he Fourth Amendment protects people, not places").

Throughout Plaintiff's papers and Rule 56.1 statement, Plaintiff contends that "she did not have dominion and control over that apartment."  (Pl. Br., Dkt. 59, at 9.)  Plaintiff also testified that she did not have a key to the second floor apartment at the time the search warrant was executed.  (Transcript of Plaintiff's Deposition, Dkt. 60-2, 47:15–18.)  Plaintiff cannot claim a "legitimate expectation of privacy in the" second floor apartment unless that apartment was her home at the time the apartment was searched.  *Carter*, 525 U.S. at 89.  Therefore, because Plaintiff contends that she did not have dominion and control over the second floor apartment, she cannot prevail on an unreasonable search claim relating to that apartment.[4]

\*　\*　\*　\*

The search warrant relied on by Defendant Morris in searching the Premises was valid both under *Franks* and the particularity requirement.  Given the warrant's validity, the Court similarly finds that Plaintiff's and her family's detention during the execution of the warrant was valid.  *See*

---

[4] The Court does not reach the qualified immunity issue with respect to Plaintiff's unlawful search claim.  *See WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 52 (2d Cir. 2009) ("Because we conclude that there was no violation of the plaintiffs' constitutional rights, we do not reach the issue[ ] of qualified immunity[.]").  "However, if the Court were to address this issue, it would conclude that Officer [Morris] possessed arguable probable cause to conduct the [search], in that 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Stwaerd v. City of New York*, No. 09-CV-936 (PKC), 2014 WL 4384471, at \*6 n.14 (E.D.N.Y. Sept. 4, 2014) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991), *cert. denied*, 505 U.S. 1221 (1992)).

*Muehler v. Mena*, 544 U.S. 93, 98 (2005).  Accordingly, Defendant Morris's motion for summary judgment on Plaintiff's unlawful search claim is granted.

## III.   False Arrest

### A.   Legal Standard

"Claims for false arrest brought under Section 1983 are 'substantially the same' as claims for false arrest under state law." *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021). "Under New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* (cleaned up).

"Probable cause is a complete defense to a constitutional claim of false arrest. . . ." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014).  "Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Id.*  "More specifically, probable cause exists if a law enforcement officer received information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." *Id.*  "[A] police officer is not liable for a false arrest under Section 1983 if probable cause to arrest the plaintiff existed for any crime—whether or not that particular crime was closely related to the offense the officers said was the reason for arrest." *Kee*, 12 F.4th at 158–59.

"[T]he probable-cause-to-arrest inquiry is generally limited to whether the facts known by the arresting officer at the time of the arrest objectively provide probable cause to arrest." *United States v. Pabon*, 871 F.3d 164, 176 n.5 (2d Cir. 2017) (citations and internal quotation marks omitted).  "To determine whether probable cause exists, [courts] look at the facts as the officers

knew them in light of the specific elements of the offense . . . considering the totality of the circumstances and the perspective of a reasonable police officer in light of his training and experience." *Caravalho v. City of New York*, 732 F. App'x 18, 22 (2d Cir. 2018) (internal quotation marks and citations omitted). "Questions of historical fact regarding the officers' knowledge at the time of arrest are to be resolved by the jury." *Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017). "However, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Id.* (internal quotation marks omitted). "Review for probable cause should encompass 'plainly exculpatory evidence' alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest." *Stansbury v. Wertman*, 721 F.3d 84, 93 (2d Cir. 2013).

**B.    Analysis**

Plaintiff alleges that Defendant Morris's arrest of Plaintiff for theft of services was based "on an incorrect hunch" because Plaintiff's only link to the diversion of electricity is that she lived in the Premises. (Pl. Br., Dkt. 59, at 12.) Plaintiff further argues that, because the electricity was diverted to the second floor and she had no control or dominion over that floor, there was no probable cause to arrest Plaintiff for theft of services. (*Id.*) The Court disagrees and concludes that Defendant had probable cause to arrest Plaintiff for theft of services.

Because the existence of probable cause is analyzed based on "the facts as the officers knew them in light of the specific elements of the offense," *Caravalho*, 732 F. App'x at 22 (internal quotations and citations omitted), the Court begins its analysis with New York's theft of services statute. Under New York law, "[a] person is guilty of theft of services when . . . [w]ith intent to avoid payment by himself or another person of the lawful charge for any telecommunications service, including, without limitation, . . . electrical . . . service which is provided for a charge or

compensation, he . . . avoids or attempts to avoid payment therefor by himself or another person by means of (a) tampering or making connection with the equipment of the supplier." N.Y. Penal L. 165.15(4). Thus, and as relevant here, the statute requires (1) intent to avoid payment for services and (2) successful avoidance or attempt to do so (3) by tampering with the equipment. "A person who tampers with such a device or equipment without the consent of the supplier of the service is presumed to do so with intent to avoid, or to enable another to avoid, payment for the service involved." *Id.* As is evident, the statute specifically provides that a person is guilty of theft of services even where their avoidance or attempt to avoid payment is for the benefit of another person—*i.e.*, it helps or attempts to help another person to avoid payment for services. *Id.*

Turning to the undisputed facts here, the Premises has two electrical meters, marked "1st Fl" and "2nd Fl," "located in the basement of the" Premises.[5] (Pl. 56.1, Dkt. 57, ¶¶ 16–17.) Plaintiff had access to the basement from the first floor of the Premises. (*Id.* ¶ 7.) ConEd representatives were present during the search of the Premises and "determined that $64,792.73 in unmetered electrical service had been diverted to the second floor of the" Premises. (*Id.* ¶¶ 46– 47; *see also* Preliminary Estimated Bill for Unmetered Service, Dkt. 60-12.)

Based on these facts, Defendant Morris had probable cause to arrest Plaintiff for theft of services. First, it is undisputed that Plaintiff had access to the basement at the time of the search and there is nothing in the record to suggest that Plaintiff did not have access to the part of the

---

[5] Plaintiff states that the meters were marked as such on the day of the search; Defendant Morris admits only "that on September 11, 2019, the date defense counsel conducted an inspection of the premises, the electrical meters were marked as such." (Pl. 56.1, Dkt. 57, ¶ 16.) The Court does not need to resolve this factual disagreement because whether the meters were marked on the day of the search is not a genuine issue of material fact and does not affect the Court's analysis here.

basement where the two meters were located, or that Defendant Morris had any reason to believe that Plaintiff did not have access to the meters.  Second, the ConEd representatives determined that there was over $64,000 worth of services in avoided payments.  Third, ConEd representatives determined that the payment was avoided by diversion of services, which suggests that the meters were manipulated or tampered with.  (*See* Dkt. 54-13, at ECF 6.)  Lastly, based on these facts  and pursuant to New York law, Plaintiff could be presumed to have intended to divert electricity and, as a result, to avoid payment for services by her or another person to ConEd.

Plaintiff argues that because the electricity was diverted to the second floor apartment, which, according to Plaintiff, she had no control or dominion over, there was no probable cause to arrest her for theft of services.  That argument is unavailing in light of the specific language of the statute that provides that a person is guilty of theft of services for her own or another person's benefit.  N.Y. Penal L. 165.15(4).  Thus, even viewing the evidence in the light most favorable to Plaintiff, considering the totality of the circumstances, and accepting that (1) Plaintiff did not have control of the second floor apartment and (2) Defendant knew or should have known that Plaintiff did not have such control, Defendant Morris could nevertheless reasonably believe that Plaintiff, who had access to the meters, intentionally diverted electricity for the benefit of the second floor apartment's occupant. *Betts*, 751 F.3d at 82 ("Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.").  This conclusion was supported both by the officers' findings at the time of the search and the ConEd record that Defendant had obtained prior to the search indicating that both the first and second floor apartments were listed under a single account in Plaintiff's mother's name.

The Court need not address whether probable cause existed for other justifications for arrest because "a police officer is not liable for a false arrest under Section 1983 if probable cause to arrest the plaintiff existed for any crime." *Kee*, 12 F.4th at 158–59 (internal quotation marks and citations omitted).[6]

\* \* \* \*

Defendant Morris had probable cause to arrest Plaintiff for theft of services. Accordingly, Defendant Morris's motion for summary judgment on Plaintiff's false arrest claim is granted.

## IV. John Doe Defendants

Plaintiff brought this case against Defendant Morris and John Doe Defendants 1–10 in June 2018. (*See* Dkt. 1.) Despite having engaged in extensive discovery for over two years (*see* 10/5/2020 Minute Entry (denying Plaintiff's motion to reopen the deposition of Defendant Morris but allowing Plaintiff to serve five interrogatories to Defendant Morris, "limited in subject matter to [] two issues . . . , by October 7, 2020)), Plaintiff has neither identified the John Doe Defendants nor moved to amend the complaint to name them. "Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that [s]he has made any effort to discover the defendant's name, . . . the plaintiff simply cannot continue to maintain a suit against the John Doe defendant." *Coward v. Town and Village of Harrison*, 665 F. Supp. 2d 281, 300 (S.D.N.Y. 2009)

---

[6] Given the Court's finding that defendant Morris had probable cause to arrest Plaintiff, there is no need to reach the qualified immunity issue. *WWBITV, Inc.*, 589 F.3d at 52 ("Because we conclude that there was no violation of the plaintiffs' constitutional rights, we do not reach the issue[ ] of qualified immunity[.]"). However, even assuming that Defendant Morris did not have probable cause to arrest Plaintiff for theft of services, Defendant Morris is entitled to qualified immunity because "it was objectively reasonable for her to believe that her actions were lawful at the time of the challenged act." *Frost v. N.Y.C. Police Dep't.*, 980 F.3d 231, 243 n.8 (2d. Cir. 2020). Defendant Morris's determination that Plaintiff was guilty of theft of services is objectively reasonable because "there was 'arguable' probable cause at the time of the arrest" in that "officers of reasonable competence could disagree on whether the probable cause test was met." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013).

23

(cleaned up); *see also Nagair v. New England Motor Freight, Inc.*, No. 16-CV-5898 (AMD) (RLM), 2018 WL 6272751, at *3 n.6 (E.D.N.Y. Nov. 30, 2018) ("Although the 'John Doe' [defendant] has not entered an appearance in this action and does not move for summary judgment, I *sua sponte* dismiss the action against this defendant because the case has been pending for two years—and the accident occurred over five years ago—and the plaintiff has not identified this defendant." (collecting cases)); *Blake v. Race*, 487 F. Supp. 2d 187, 192 n.1 (E.D.N.Y. 2007) ("[T]he Court dismisses the claims against the unnamed John Doe defendants. Though discovery is complete in this case, plaintiff has failed to identify any of the unnamed defendants, or to present any evidence demonstrating their involvement in the infringing activity. Moreover, plaintiff's opposition to defendants' motion for summary judgement does not specify the role of any unnamed defendants in the infringing conduct, nor does plaintiff indicate that [s]he will be able to identify these unnamed defendants in the future.").

Plaintiff's claims against John Doe Defendants 1–10 are therefore dismissed without prejudice. *See, e.g.*, *Gordon v. Emmanuel*, No. 15-CV-2439 (CBA) (SJB), 2018 WL 4688935, at *12 (E.D.N.Y. Sept. 28, 2018) (*sua sponte* dismissing without prejudice claims against unnamed defendants where plaintiff "failed to identify any of the unnamed defendants" through discovery or "present any evidence demonstrating their involvement in the [challenged] activity).

## CONCLUSION

For the reasons set forth herein, the Court grants Defendant Morris's motion for summary judgment. Plaintiff's claims against Defendant Morris are therefore dismissed with prejudice. Additionally, Plaintiff's claims against the John Doe 1-10 Defendants are dismissed without prejudice. The Clerk of Court is respectfully directed to enter judgment accordingly and close this case.

24

SO ORDERED.

/s/ *Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 30, 2022
      Brooklyn, New York